UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| LINDA LEE OTT,<br><br>                    Plaintiff,<br><br>        v.<br><br>CAROLYN W. COLVIN,<br><br>                    Defendant. | Case No.  12-cv-04597-NJV<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REMANDING CASE FOR FURTHER PROCEEDINGS**<br><br>Re: Dkt. Nos. 12, 13 |

Before her death, Linda Lee Ott applied for Title II Social Security Disability benefits. Her application was denied initially and on reconsideration.  Ms. Ott died on July 22, 2009, and her husband ("Claimant") was substituted for her and continued the proceedings before the Social Security Administration ("SSA").  Claimant requested a hearing before an administrative law judge ("ALJ"), which took place on January 13, 2011. *See* Administrative Record ("AR") at 85. The ALJ denied benefits, and the Appeals Council affirmed that decision, making it the final decision of the Commissioner.  Claimant appeals to this court.  Both parties having consented to the jurisdiction of a magistrate judge (Doc. Nos. 4 & 5), this court may decide Claimant's motion for summary judgment.

For the reasons below, the court will grant Claimant's motion and remand the case for further proceedings consistent with this order.

# BACKGROUND

### A.    Ms. Ott's Application For Disability.

Ms. Ott complained for years about numerous symptoms, including pain in her chest, incontinence, constipation, nausea and vomiting, tingling and numbness in her extremities, and

United States District Court
Northern District of California

United States District Court
Northern District of California

chronic pain.  Despite the numerous examinations, consultations, and tests she underwent, no physician was ever able to diagnose the physiological basis for Ms. Ott's principal complaints.   In 2007, Ms. Ott cut back her work as a nurse because of chronic pain and vomiting.  AR 359.

When Ms. Ott stopped working altogether in April 2008 (AR 363), she applied for disability benefits, claiming she was unable to work because of "gallbladder problems, radiculopathy, chronic [] pain, anorexia, anemia, h. pylori, blood clots, bilateral weakness in extremities, anxiety and depression."  *See* AR 137.  The SSA reviewed Ms. Ott's claim for disability benefits, identifying her primary diagnosis as "Sprains and Strains - All Types" and her secondary diagnosis as "Anxiety Disorders."  AR 132.  The SSA concluded that Ms. Ott had "a history of nausea and vomiting along with weight loss.  We have determined that this impairment does not meet or equal the listing of impairments.  Though you do have discomfort, the evidence shows you are still able to move about . . . in a satisfactory manner."  AR 138.  Ms. Ott was found not disabled initially and on reconsideration.  AR 132-132, 137-148 (discomfort and limited strength, but can continue to perform light work).  Claimant requested a hearing before the ALJ.

**B.     Testimony Of The Medical Expert Before The ALJ.**

At the beginning of the hearing, the ALJ explained that he "thought it was necessary to have the assistance of a medical expert" to analyze Ms. Ott's records.  AR 91.  Dr. Gerber was selected as the medical expert ("ME").  However, Dr. Gerber never received all of Ms. Ott's medical records.  AR 93.  He testified based only on his review of the first 17 exhibits, when the AR included 25 exhibits of medical records.  AR 90-91.

Based on his review of the incomplete medical records, Dr. Gerber testified that "there's a history of gastritis and degenerative disc disease involving the cervical and the lumbar spine."  AR 94-95.  He found no cause for, and no independent confirmation in the record of, Ms. Ott's reports of chronic nausea and vomiting.  AR 95-96.  On the contrary, he found a "striking inconsistency between the complaint and the lack of any metabolic or laboratory abnormality, and a lack of any change in body weight for a three-year period of time."  AR 98; *see also* AR 96 ("The weight going back to 2006 was 120 . . . And in June of '09 it was 120"), AR 103-104 (reiterating that there was no objective evidence of nausea and vomiting in AR: "My testimony relates to the

1    objective material in the file.  I can't argue with a subjective report of symptoms"), AR 107.  Dr.

2    Gerber stressed the absence of any "independent, objective confirmation of significant vomiting."

3    AR 98.

4            Dr. Gerber testified that there appeared to be "a strong psychological component" to Ms.

5    Ott's symptoms.  AR 99-100.  He also noted that Ms. Ott was taking "rather potent narcotic

6    medications for unclear reasons" and while these prescriptions could cause her symptoms, "it's not

7    clear from the record" whether this was the case.  AR 99-100, 107-108.

8            Based on his review of the 17 exhibits he received (1/F through 17/F), Dr. Gerber found

9    evidence of degenerative disc disease in the cervical spine, and opined that this would have

10   imposed light limitations in Ms. Ott's functional ability.  AR 96-97.  Ms. Ott's treating physician

11   (Dr. Clark) had opined that Ms. Ott was limited to lifting/carrying less than 10 pounds and to

12   standing/walking less than two hours in an eight-hour workday due to cervical neuritis.  *See* AR

13   313-314.  Dr. Gerber disagreed, testifying that "there was no basis for this opinion."  AR 97.

14   When asked whether MRI results that revealed bulging in Ms. Ott's lumbar area evidenced lower

15   extremity weakness, Dr. Gerber testified that "an MRI does not determine weakness.  It just

16   demonstrates the degenerative disc disease, but there were no findings on neurologic

17   examinations."  AR 110-111; *see also* AR 112 ("I testified previously that there was degenerative

18   disc disease of the spine.  However there were no neurologic abnormalities that were documented

19   at the time").

20           The eight exhibits Dr. Gerber did not receive, and thus could not opine about, consist of

21   medical records dated between November 2005 (Ex. 25/F) and June 2009 (Ex. 21/F).  The missing

22   exhibits include the complete records of Ms. Ott's visits to a pain expert (Dr. Connie Basch)

23   between March 2006 and May 2007 (Ex. 19/F).  These records document Ms. Ott's complaints of

24   chronic pain, vomiting, and side effects of the numerous medications that she took throughout this

25   period.  As described in further detail below, the missing records also include notes by different

26   treaters who observed Ms. Ott vomiting.  Finally, the missing records also include additional MRI

27   results, which found abnormalities in Ms Ott's cervical spine that "could cause a right C6

28   radiculopathy."  AR 752-53; *see also* AR 754 ("This could cause a radiculopathy of the right C6

United States District Court
Northern District of California

3

1    nerve root").

2         The ALJ asked the expert to testify about Ms. Ott's medical condition based solely on

3    exhibits 1-17, without considering the evidence contained in exhibits 18-25.  In particular, the ALJ

4    asked Dr. Gerber to identify a physiological basis for Ms. Ott's impairments, whether Ms. Ott met

5    any listed impairment, whether he concurred with Dr. Clark's assessment of Ms. Ott's limitations,

6    and to formulate an opinion regarding Ms. Ott's limitations.  AR 95-108.  The ALJ did not

7    continue the hearing to allow the expert to review the missing documents, nor did he supplement

8    the expert's testimony by using post-hearing interrogatories.  The ALJ did not explain on the

9    record why he did not need the ME's assistance with respect to exhibits 18-25.  The Claimant's

10   attorney did not cross-examine the expert on the contents of exhibits 18-25.

11   **C.    The ALJ's Decision.**

12        The ALJ applied the five-step sequential evaluation set out at 20 C.F.R. § 404.1520 to

13   determine whether Ms. Ott was disabled.

14        At step one, the ALJ found that Ms. Ott had not engaged in substantial activity between the

15   alleged onset date of April 29, 2008 and her death on July 22, 2009.  AR 32.

16        At step two, he found that Ms. Ott had a number of severe impairments: "degenerative disc

17   disease, status-post gallbladder removal, anemia, tuberculosis, gastritis, gram-negative bacterimia,

18   fibromyalgia, bronchitis and urinary tract infection."  AR 32.  He found that Ms. Ott did not suffer

19   from any severe mental impairment.  AR 33.

20        At step three, the ALJ found that Ms. Ott did not have an impairment or combination of

21   impairments that met or medically equaled a listed impairment.  AR 33.  (The ALJ did not provide

22   the basis for his reasoning, but the court notes that Dr. Gerber testified that based on his review of

23   exhibits 1-17, Ms. Ott did not meet any listing.  AR 95.)  Before proceeding to step four, the ALJ

24   reviewed the record to determine Ms. Ott's residual functional capacity ("RFC") before her death.

25   He concluded that she had the RFC to perform light work, with some limitations.  AR 33-36.  The

26   ALJ based his RFC finding on several grounds.  First, he noted that no treating physician had

27   diagnosed a physiological basis for Ms. Ott's symptoms, and that her diagnostic tests were all

28   within normal limits.  AR 34-35.  Similarly, he pointed out that the Social Security

United States District Court
Northern District of California

4

1    Administration's Consultative Examiner could find no physiological basis for Ms. Ott's

2    complaints.  AR 34.  The ALJ then summarized Dr. Gerber's testimony as follows:

3            The ME pointed out that although the claimant reported vomiting
             "dozens and dozens" of times throughout the day for at least 3-
4            years, her reported weight at physical examinations was essentially
             unchanged.  .  .  .  The slight but steady increase in the claimant's
5            weight is inconsistent with the reported inability to retain any fluids
             or solids.

6

7    AR 34.

8            The ALJ addressed the opinion of her treating physician, Dr. Clark, who opined that Ms.

9    Ott "could not perform even sedentary exertional level work secondary to cervical neuritis, with

10   extreme limitations in all physical and postural movements."  AR 35 (citing F/6, AR 313-14).  The

11   ALJ noted that Dr. Clark's opinion was "not supported by the clinical or diagnostic record in any

12   way[, and that] Dr. Clark offers no rationale to support his contentions."  AR 35.  He found that

13   Ms. Ott's cervical MRI did not "support the extreme limitations asserted by Dr. Clark, . . . with

14   only a mild disc space narrowing at the C5-6 and a right-sided spur which 'could' cause

15   radiculopathy."  AR 35 (citing F/11, AR 413).  Similarly, he found that Dr. Clark's fibromyalgia

16   diagnosis was not supported by tests or trigger points.  *Id.*  He further noted that Dr. Clark's own

17   treatment notes report "repeated completely normal physical examinations."  AR 35.  Although

18   the ALJ does not cite Dr. Gerber's testimony when critiquing Dr. Clark's opinion, the ALJ's

19   findings are consistent with Dr. Gerber's testimony, with the findings of the SSA consultant who

20   examined Ms. Ott in September 2008 (AR 308-12), and with the findings of the SSA non-

21   examining consultant who reviewed Ms. Ott's file in October 2008 (AR 315-20).  The ALJ also

22   rejected, in part, Ms. Ott's pain and symptoms testimony.  AR 34-35 (alleged paralysis

23   disappeared when she was distracted; all examinations normal; sleight but steady increase in

24   weight belied claim she could not retain fluids or solids over two-year period).

25           At step four, the ALJ found that Ms. Ott was unable to perform any past relevant work.

26           Finally, at step five, the ALJ found (based on the testimony of a vocational expert) that

27   there existed jobs in significant numbers in the national economy that the claimant could have

28   performed.  Thus, he found Ms. Ott was not disabled.

United States District Court
Northern District of California

5

As described above, the ALJ engaged the services of a medical expert to review and interpret the medical records because he believed it was "necessary" to do so.  AR 91.  The ALJ's decision denying disability benefits was based, in part, on the medical expert's testimony.  AR 34. The ALJ did not reconcile his stated need for medical expert testimony with the fact that the medical expert testified based on an incomplete record.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error.  *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).  Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997).  "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998).  The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## DISCUSSION

### A.    The ALJ Erred In Failing To Provide The Entire Record To Dr. Gerber.

An administrative law judge always has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered . . . even when the claimant is represented by counsel." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).  This "special duty" is triggered only when "the record is inadequate to allow for proper evaluation of the evidence." *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011).  The ALJ here attempted to discharge his duty by obtaining Ms. Ott's medical records from her numerous providers and by arranging psychiatric and medical consultative examinations.  In addition, he found it "necessary" to obtain the assistance of a medical expert, and retained Dr. Gerber to analyze the medical records

United States District Court
Northern District of California

6

1   and testify at the hearing.  Unfortunately, Dr. Gerber did not receive all of Ms. Ott's medical

2   records and thus the opinion he rendered during the hearing was not based on a "full and fairly

3   developed" record.  It was based on an admittedly incomplete record, which the ALJ had found

4   sufficiently ambiguous to require the interpretation of a medical expert.  The ALJ did not explain

5   either during the hearing or in his decision why he did not need Dr. Gerber's assistance to interpret

6   exhibits 18-25.  It was error for the ALJ to fail to provide the missing exhibits to Dr. Gerber, either

7   before or after the hearing, and fail to allow Dr. Gerber to revise his opinion based on the missing

8   medical records.  *See* 20 C.F.R. § 404.1526(c) ("When we determine if your impairment medically

9   equals a listing, we consider <u>all</u> evidence in your case record about your impairment(s) and its

10  effects on you that is relevant to this finding") (emphasis added)); *see also* HALLEX[1] I-2-5-39

11  ("Before the ME testifies, the ALJ must: ensure on the record that the ME has examined <u>all</u>

12  medical and other evidence of record") (emphasis added).

**B.      The Error Was Not Harmless.**

13

14          The error was not harmless, as it may have affected Dr. Gerber's analysis of Ms. Ott's

15  impairments, the ALJ's analysis of Ms. Ott's credibility, and the vocational expert's opinion that

16  Ms. Ott could perform work found in significant numbers in the national economy.

17          *Hayes v. Astrue*, 270 Fed. Appx. 502 (9th Cir. 2008), is instructive.  In *Hayes*, a claimant

18  independently obtained a nerve conduction study, which determined that she tested positive for an

19  indicator of carpal tunnel syndrome.  The claimant also was evaluated by an SSA consultative

20  examiner ("CE"), who determined that she did not have carpal tunnel syndrome.  The claimant

21  had informed the CE about the recent nerve conduction study, but the CE did not review the nerve

22  study results or include them in his report.  The administrative law judge who reviewed the

23  claimant's disability application relied heavily on the CE's evaluation, and "he failed to mention

24  the existence of the nerve conduction study and its results or to explain why its results did not alter

25  his determination that [the claimant] was not disabled."  *Id*. at 504.  On appeal, the Ninth Circuit

26

27  _____

[1]  HALLEX is the SSA's Hearings, Appeals, and Litigation Manual.  Although HALLEX is

28  purely an "internal guidance tool" and has no force of law, it is "entitled to respect."  *See Clark v. Astrue*, 529 F.3d 1211, 1216 (9th Cir. 2008).

United States District Court
Northern District of California

reversed and remanded:

> [I]t was error for the ALJ to fail to consider the nerve conduction study results, as they were available and could have been produced to the ALJ upon request, and the examining physician was aware of their existence . . . [The] error was not harmless, as it may have impacted the ALJ's determination, among other issues, of the credibility of Hayes' testimony concerning the numbness and pain in her left arm.  The ALJ's finding that her testimony was not credible may very well have changed in light of corroborating medical evidence from a treating physician.  Further, the ALJ relied heavily on [the CE's] evaluation.  However, that evaluation specifically noted that [the CE] did not have the results of the nerve conduction study to consider and therefore did not take the study's results into account.  If [the CE] had considered the nerve conduction study, his evaluation may have reached a different conclusion. Given the ALJ's substantial reliance on that evaluation, the omission of the nerve conduction study both from that evaluation and from the ALJ's own independent consideration of the evidence constituted legal error.

270 Fed. Appx. at 504-505.  Unlike the ALJ in *Hayes*, the ALJ here did review and rely upon all Ms. Ott's medical records, including those records that were not forwarded to Dr. Gerber.  *See* AR 34-35 (citing exhibits 18/F, 20/F, 23/F, and 24/F).  However, the fact certain records were not provided to Dr. Gerber may have influenced Dr. Gerber's medical opinion(s), and in turn may have influenced the ALJ's decision to the extent it relied on Dr. Gerber's opinion(s).

The ALJ found that Ms. Ott was not credible with respect to her frequent nausea and vomiting.  AR 34.  Citing Dr. Gerber's testimony in his decision, the ALJ found that the "slight but steady increase in the claimant's weight is inconsistent with the reported inability to retain any fluids or solids."  AR 34.  Dr. Gerber testified that Ms. Ott's weight was 120 pounds in 2006 and in 2009, and that "there was no confirmation" of Ms. Ott vomiting.  AR 95-96.  He also read into the record one of her treater's observations that "it was 'interesting that there were no metabolic or laboratory abnormalities consistent with severe vomiting.'"  *See* AR 95-96; *see also* AR 98 ("there's a striking inconsistency between the complaint [of frequent emesis] and the lack of any metabolic or laboratory abnormality, and a lack of any change in body weight for a three year period").

However, Dr. Gerber's testimony regarding Ms. Ott's "essentially unchanged weight" is contradicted by the AR.  *See, e.g.*, AR 683-766.  In March 2006, Dr. Basch recorded Ms. Ott's

8

weight as 115 pounds.  AR 721; *see also* AR 292 (an infectious disease specialist recorded Ms. Ott's weight as 116 pounds in April 2006).  (In June 2006, Ms. Ott reported to her rheumatologist that her recent 26-pound weight loss was the result of her inability to retain food or fluids.  AR 737.)  In January 2007, Dr. Zagone examined Ms. Ott and recorded her weight as 121 pounds.  AR 681.  Ms. Ott's treating physician, Dr. Clark, recorded her weight during his initial consultation in February 2007 as 127.5 pounds; in May 2007, her weight had increased to 132 pounds; in June 2007 she weighed 137 pounds; in September 2007, 138 pounds; in April 2008, 125.5 pounds; in September 2008, 122 pounds; in March 2009, 124.5 pounds; in April 2009, 127 pounds.  AR 347-371; *see also* AR 694, 704, 721, 759.  Thus, various treaters recorded significant fluctuations in Ms. Ott's weight between March 2006 and April 2009, including a twenty-three pound weight gain between January 2006 and September 2007, and subsequent sixteen-pound weight loss through September 2008.[2]

Equally significant, the exhibits that were not provided to Dr. Gerber also contradict his testimony regarding the lack of objective evidence of nausea and vomiting.  Dr. Basch observed Ms. Ott vomit in her office in April 2007.  AR 686-87.  (Ms. Ott consulted with Dr. Basch from March 2006 to May 2007 in an attempt to diagnose and manage her chronic nausea and vomiting. AR 683-721.)  Dr. Sheldon Meshulam noted that Ms. Ott vomited "some tan material" during her February 2008 visit to his office (AR 724).  In February 2006, Dr. Tuan noted that Ms. Ott reported that,

> [w]hile in-house, the patient did throw up several times, often after eating solid food or swallowing a pill.  The volume of this emesis was rarely large, usually in the 50-100 cc realm, and many of the episodes were not witnesses by the nursing staff and only reported by the patient.  [After being placed on a clear diet . . ] she had no episodes of emesis whatsoever.

AR 762.  When she was admitted to Mad River Community Hospital in June 2009, she presented with poorly controlled nausea and was dehydrated.  AR 740.  Dr. Clark noted that her chronic

---

[2]  Defendant has selected records suggesting Ms. Ott's weight was "essentially unchanged" and displayed a "slight but steady increase" (Doc. No. 13 at 5), but fails to acknowledge the significant fluctuations between the selected points of reference.  Moreover, it is pure speculation whether Ms. Ott's weight would have continued this "slight but steady increase" if she had survived, or whether it would have continued to fluctuate.

United States District Court
Northern District of California

1  nausea and vomiting "remained an active medical problem throughout her hospital stay . . . There

2  was modest clinical improvement in symptoms and reinstitution of oral intake during hospital

3  stay." AR 741. The missing documents therefore offer confirmation by four different treaters that

4  Ms. Ott was, indeed, vomiting despite the lack of positive diagnosis or test results suggesting she

5  would experience this symptom.

6        The missing records also include a June 2009 Consultation Report by a gastroenterologist

7  who opined that "a motility disorder seems very likely" to be the cause of her nausea and

8  vomiting. AR 745. The ME did not have the benefit of reviewing this report, which suggests a

9  physical cause for Ms. Ott's condition, before rendering his opinion that no physician had found a

10 physiological basis for her symptoms.

11       The exhibits that were not provided to Dr. Gerber therefore contain information that may

12 have affected his opinion. This, in turn, may have affected the ALJ's evaluation of Ms. Ott's

13 credibility and his analysis of her impairments and her RFC.[3] Equally important, the

14 corroboration of Ms. Ott's nausea and vomiting symptoms may have caused the ALJ to reach a

15 different conclusion with respect to Ms. Ott's ability to perform work available in significant

16 numbers in the national economy, given that the vocational expert testified that an individual who

17 was required to take five to ten breaks a day to vomit could not perform any of the "light level" or

18 "sedentary level" unskilled work she identified during the hearing. AR 126-130. The court finds

19 that the failure to provide the entire record to Dr. Gerber was not harmless.[4]

20 _____

21 [3]  Claimant also argues that the nausea and vomiting could have been side effects of one or more
   of Ms. Ott's medications. Doc. No. 12 at 10-11. Dr. Gerber testified it was "possible" that drug
22 interactions could be the cause of the nausea and vomiting. *See* AR 99-100; *see also* AR 727 (Dr.
   Meshulam noted that "[c]ertainly, her narcotics could be playing a role in this"). Dr. Basch,
23 however, did "not think [her] nausea is caused by the medications." AR 703. Nonetheless, the
   ALJ on remand should ensure the nausea and vomiting -- to the extent he credits Ms. Ott's
24 statements regarding those symptoms -- are reflected in the RFC analysis.
   [4]  The missing exhibits also included additional MRI results (AR 752-754), which provided
25 additional evidence of disc degeneration. Claimant argues that these results "support[] Ms. Ott's
   complaints of right arm weakness." Doc. No. 18 at 3. The court notes that Dr. Gerber
26 differentiated in his testimony between MRI results, which indicate disc degeneration, and
   neurological exams, which indicate resulting weakness. AR 111. Dr. Gerber agreed that there
27 was evidence of disc degeneration in the AR, but found no evidence of resulting weakness. The
   MRI results included in the missing exhibits (AR 752-754) thus would not necessarily cause Dr.
28 Gerber to revise his opinions. On remand, however, the ME will review the missing exhibits,
   including the MRI results.

# CONCLUSION

For the reasons stated above, the court grants Claimant's motion for summary judgment. The case must be remanded to allow the medical expert to review exhibits 18/F through 25/F and to revise his opinions and the testimony he offered during the hearing as appropriate. The ALJ shall evaluate, with the ME's assistance, the entire record to determine whether Ms. Ott was entitled to disability benefits.[5] The ALJ shall issue a new decision incorporating the ME's revised opinions.

The clerk of the court is directed to close the case.

**IT IS SO ORDERED**.

Dated: June 4, 2013

_____

NANDOR J. VADAS
United States Magistrate Judge

---

[5]  In his reply brief, Claimant asks the SSA to grant his deceased wife's claim for "disability benefits from May 9, 2007 through her date of death on July 22, 2009." Doc. No. 18 at 5. This appears to be a typographical error, as Ms. Ott protectively filed a Title II application on May 9, 2008, alleging an onset date of April 29, 2008. AR 30.

11